IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ROBERT H. WRIGHT, JR.,            *

    Plaintiff,                    *

vs.                               *

S/A JERALD WATSON, JOHN           *       CASE NO. 4:15-CV-34 (CDL)
GOODRICH, and MIKE PITTS, *in*
*their individual capacities*,    *

    Defendants.                   *

_____

## O R D E R

We are all familiar with the English common-law maxim that "a man's home is his castle." And few of us would disagree with Justice Louis Brandeis's observation that the right to be left alone is "the most comprehensive of rights and the right most valued by civilized men."[1] In this case, law enforcement officials certainly did not leave Plaintiff Robert Wright alone. In fact, they invaded his castle. More precisely, they hovered over his rural home in a helicopter, saw what they believed to be a patch of marijuana on his neighbor's adjacent property, trespassed on Mr. Wright's property to investigate, snooped around the shed near his home, searched the inside of his home pursuant to a search warrant obtained through the use of alleged

---

[1] *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

false information, and then arrested and prosecuted Mr. Wright based on evidence found inside his home.

The issue to be decided today, however, is not whether this clear invasion of Mr. Wright's privacy by law enforcement officers is generally offensive. The issue is whether that invasion violated Mr. Wright's right to be free from unreasonable searches and seizures under the Fourth Amendment to the Constitution. Specifically, the Court must decide whether the law enforcement officials whom Mr. Wright has sued for damages because of this conduct violated clearly established law and thus lose their qualified and official immunity. This inquiry requires that the Court carefully analyze how far Mr. Wright's castle extends for Fourth Amendment purposes. The Court must also consider the conduct of Defendants in trespassing upon the property, providing the magistrate with allegedly false information to obtain a search warrant, and then arresting Mr. Wright and prosecuting him based on evidence obtained pursuant to the search warrant.

Mr. Wright asserts federal law claims pursuant to 42 U.S.C. § 1983 against Defendants in their individual capacities for alleged violations of the Fourth Amendment. He also asserts state law claims arising from that same conduct. Defendants seek summary judgment on their qualified and official immunity defenses. As explained in the remainder of this Order, the

Court finds that Defendant Mike Pitts is entitled to qualified and official immunity as a matter of law as to all of Mr. Wright's claims against him, and therefore, Defendants' Motion for summary judgment (ECF No. 71) is granted in its entirety as to those claims against Pitts.  The Court finds that Defendants Jerald Watson and John Goodrich are not entitled to qualified or official immunity as a matter of law as to Mr. Wright's claims against them that the search of his home violated the Fourth Amendment because they supplied the magistrate with allegedly false information in support of the warrant application. Therefore, their motion for summary judgment (ECF No. 71) is denied as to those claims.  Watson and Goodrich, however, are entitled to qualified and official immunity as a matter of law as to Mr. Wright's other claims, and thus their motion for summary judgment is granted as to those claims.  Accordingly, the only claims remaining for trial are Mr. Wright's Fourth Amendment and state law claims against Watson and Goodrich arising from the search of Mr. Wright's home, which claims are based on Mr. Wright's contention that these Defendants supplied false information in support of the search warrant application.

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.   *Id.*

Here, Defendants seek summary judgment on their qualified immunity defenses.   Thus, the question is whether Defendants are entitled to qualified immunity based on the evidence viewed in the light most favorable to Mr. Wright, with all reasonable inferences drawn in his favor   *See Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) (explaining that the court "must review the evidence in this manner 'because the issues . . . concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law.'" (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002))).   If, taking the evidence in the light most favorable to Mr. Wright, a Defendant's conduct would not amount to a violation of clearly established Fourth Amendment law, then summary judgment must be granted in that Defendant's favor based on qualified immunity.   *See Lee*

(emphasizing that the plaintiff must show the violation of a constitutional right "under the *plaintiff's* version of the facts").

FACTUAL BACKGROUND

Viewed in the light most favorable to Mr. Wright, the record reveals the following.

## I.  The Wright Property

Plaintiff Robert H. Wright, Jr. and his wife, Lisa Wright, live at 525 R.D. Brown Road in Hamilton, Georgia ("Wright Property"). R.D. Brown Road is a dirt road located off of Highway 116. Mrs. Wright owns the Wright Property, which is approximately nine and a half acres. One acre immediately surrounding the house is landscaped, with manicured grass and a garden area. The rest of the property has natural vegetation and is not landscaped.

There is a fence surrounding the north, west, and south sides of the property; in the summary judgment papers, it is a black chain-link fence.[2] There is a gate in the portion of the fence that is along the southern border of the property. There is a factual dispute as to whether the gate was locked. *Compare*

---

[2] *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. 11, ECF No. 88 (stating that the Wright Property "had a black chain-link fence all the way around it"). At the hearing on the summary judgment motion, counsel suggested that the fence along R.D. Brown Road is a split rail fence, not a chain-link fence, but counsel did not point to any evidence on this point. This fact is not material to the issues that the Court must decide.

Binion Dep. 17:3-9, ECF No. 79 (stating that he believed the gate was "closed" and that officers had to go over it) *with* Pitts Dep. 53:10-11, ECF No. 78 ("I want to say there was a gate or something where we -- it was open."). The distance between the house and the chain-link fence at the southern border of the Wright Property is not clear from the present record.

A shed is located approximately 100 to 150 yards north of the house. The shed is inside the black chain-link fence. Defendants assert that there is only natural vegetation around the shed. Defs.' Statement of Undisputed Material Facts ¶ 77, ECF No. 71-12. But they also claim that there was a "gardening area" near the shed. *Id.* ¶ 12; *accord* Bracewell Decl. ¶ 6, ECF 71-2. It is undisputed that the shed is not visible from the house, and the house is not visible from the shed. The shed itself can be seen from R.D. Brown Road, but there is a factual dispute as to whether the area around the shed could be seen from R.D. Brown Road. *Compare* R. Wright Aff. ¶ 4, ECF No. 88-1 (stating that it is not possible to see anything on the ground near the shed from the road because of dense vegetation between the road and the shed) *with* Bolen Decl. ¶ 7, ECF No. 71-3 (stating that the site was visible from R.D. Brown Road). The Wrights use the shed as a "a storage shed, tool shed" where they keep their garden tools. R. Wright Dep. 41:13-19, ECF No. 92. The shed also houses the water supply (a well) for the Wrights'

house.   R. Wright Dep. 41:13-19.   The parties did not point to any evidence that the shed could be identified as a well house without entering it.   *See* Memmo Dep. 25:22-26:1, ECF No. 87 (testifying, in response to the question whether he went "to the well house," that Agent Memmo "went to the -- I don't know it's a well house.· There was, like, a potting shed.").



L. Wright Dep. Ex. 1, Map of Site, ECF No. 93-1.

Also on the Wright Property is the grave site for Mrs. Wright's son, who died in 2007.   The grave site, which predates the house, is approximately fifty feet northwest of the house. L. Wright Dep. 55:25-56:10, ECF No. 93.   Based on the

description and drawing that was provided to the Court at the summary judgment hearing, the grave site is located between the house and the shed.  Before the house was built, Mrs. Wright permitted her son's friends to visit the gravesite.  Visits to the gravesite ceased within a year or two following his death. *Id.* at 57:15-24.

## II.  **The Helicopter Surveillance**

On June 27, 2013, the Governor's Task Force for Drug Suppression performed aerial surveillance in Harris County, Georgia as part of its marijuana eradication operation.[3]  Two Georgia state troopers, Paul Wofford and Mark Bracewell, randomly canvassed the county in a helicopter, looking for marijuana.  Bracewell observed a suspected marijuana grow site at a property on R.D. Brown Road.  The suspected grow site was south of the black chain-link fence surrounding the Wright Property.  Neither the officers in the helicopter nor the officers on the ground team knew whether the suspected grow site was on the Wright Property.  At some point, officers on the ground team reviewed property tax records and learned that Mrs. Wright owned the property at 525 R.D. Brown Road, but they did not determine whether the large suspected grow site was on that property.  Watson Dep. 87:17-22, 94:24-95:19, ECF No. 83.  It is

---

[3] The parties agreed in their fact statements that the surveillance was in January, but this appears to have been a typographical error.  *See* Webb Aff. Ex. 1, Affidavit & Application for a Search Warrant (June 27, 2013), ECF No. 71-1 at 5.

not clear from the present record how far the marijuana grow site was from the house on the Wright Property.

After Wofford confirmed the spotting of the suspected grow site, Bracewell contacted the ground team via radio and gave the team GPS coordinates for the suspected grow site. Bracewell reported to the ground team that the suspected grow site was in a clear-cut area near a black chain-link fence. Bracewell also reported to the ground team that the house at 525 R.D. Brown Road was the closest house to the suspected grow site; that there was a gate in the chain-link fence near the suspected grow site; and that there were cups, trays, and laid pinestraw at the suspected grow site. Bracewell Decl. ¶ 5. Bracewell also stated that he reported to the ground team that there was a path leading from the house at 525 R.D. Brown Road to the gate near the suspected grow site. *Id.* But there is also evidence that there is no path from the gate to the house. L. Wright Dep. 362:1-10 (stating that there is no trail between the house and the grow site); R. Wright Dep. 59:4-8 (stating that Mr. Wright is not aware of a path leading from the house to the grow site).

Bracewell also reported to the ground team that he saw a gardening area near a utility shed north of the house at 525 R.D. Brown Road. From the air, Bracewell observed small plants in cups and trays near the shed that appeared to him "to possibly be marijuana." Bracewell Decl. ¶ 6. Bracewell

acknowledged that from the air, he could not tell what type of juvenile plants were in the cups and trays; he asked the ground team to investigate to see if the cups contained marijuana. Bracewell Dep. 61:20-25, ECF No. 82.  Bracewell also reported to the ground team that he saw cups and trays near the shed "that resembled what was observed at the large marijuana grow site." Bracewell Decl. ¶ 6.  From the air, Bracewell saw what appeared to be white Styrofoam cups and black seed trays.  Bracewell Dep. 56:3-25.

Defendants assert that Bracewell observed an all terrain vehicle ("ATV") "moving locations" near the house at 525 R.D. Brown Road.  *See* Bracewell Decl. ¶ 6.  But there is a genuine factual dispute on this issue.  Mrs. Wright testified that no one moved the ATV; she was the only person at home at the time and said that she did not move the ATV on June 27, 2013.  L. Wright Dep. 183:23-25.  Bracewell stated that he reported to the ground team that he saw the ATV travel "from near the utility shed and stop[] just short of the large marijuana grow site." Bracewell Decl. ¶ 6.  But an officer on the ground team testified that he was told that the ATV was "driving away back towards the house" from the large suspected grow site.  Binion Dep. 17:12-17.

III. **The Initial Warrantless Search**

The helicopter crew asked the ground team to search both the large suspected marijuana grow site south of the black chain-link fence and the small gardening area near the Wrights' utility shed.  At some point, the ground team confirmed that the plants on the large suspected marijuana grow site were, in fact, marijuana.  Neither party pointed to evidence of when the ground team made this confirmation, and there is no evidence that the confirmation was done before the helicopter crew asked the ground team to search the area near the Wrights' shed.

Michael Binion and Jeremy Bolen, both conservation rangers with the Georgia Department of Natural Resources, were members of the ground team that responded to the scene.  According to Bolen, the helicopter crew stated that the area near the shed "had items of commonality with those seen at the large marijuana grow site, including, but not limited to, plastic cups."  Bolen Decl. ¶ 5.  Bolen and Binion searched the site near the utility shed located on the Wright's property.  They did not seek permission for the search, and they did not have a warrant.  According to Mrs. Wright, the officers had to climb over a gate in the perimeter fence to reach the site.  L. Wright Dep. 114:15-17.  Defendant Mike Pitts, a Harris County deputy sheriff, arrived at the scene to help secure the area.  He was present with Bolen and Binion for part of the time that they

searched the site near the shed.  The officers found cups and trays just outside the shed, but they did not see anything illegal in them.  Bolen Decl. ¶ 8.  According to Lisa Wright, the cups and trays contained flower seedlings, including Queen Anne's Lace, cleome, poppies, hydrangeas, and sunflowers.  L. Wright Dep. 161:22-162:9, 166:9—14.

Bolen asserts that he found plastic trays that contained between eight and ten juvenile plants under a pine tree approximately fifteen yards from the shed.  Bolen Decl. ¶ 8. Based on the description and drawing that was provided to the Court at the summary judgment hearing, the plastic trays under the pine tree were between the perimeter fence and the shed.  At some point, Defendant Jonathan Goodrich, another Harris County deputy sheriff, arrived on the scene, and Pitts told Goodrich about the large suspected marijuana grow site and about the search that had been conducted near the shed.  Goodrich joined in the search.  Bolen and Goodrich believed that the plants they found in the trays under the pine tree were marijuana, although Goodrich was not trained on how to tell the difference between juvenile marijuana plants and other similar juvenile plants. Goodrich Dep. 32:6-16, ECF No. 77; *see also* Watson Dep. 58:1-3 ("As far as I know, Deputy ·Goodrich is not marijuana examiner certified, and I don't think -- I don't know if DNR Officer Bolen is or not.").  Pitts was "unaware" of whether the plants

were marijuana.  Pitts Dep. 85:15-21.  Binion was not sure that it was marijuana, and the officers did not confiscate the plants or photograph them.  Bolen Decl. ¶ 9; Binion Dep. 9:22-25 ("[Bolen] showed me a plant and asked me what it was.· And I said ·I don't know if it's marijuana or not, I've never seen any that small."); Goodrich Dep. 35:22-36:9 (acknowledging "debate" about whether the plants were marijuana).  Mr. Wright disputes that the officers found juvenile marijuana near the shed because it is undisputed that when officers later returned to the area near the shed, there were no plants in the trays under the pine tree.  For purposes of summary judgment, the Court must conclude that no marijuana plants were found anywhere on the Wright Property prior to the issuance of the search warrant for the search inside the Wrights' home.

Bolen, Binion, and Goodrich went to the large suspected grow site that was not on the Wright Property and was outside the fence surrounding the property.  Pitts left the scene and was not involved in any subsequent actions by the law enforcement officers.  At the large grow site, where other officers had confirmed that marijuana was growing, Bolen and Goodrich found items which suggested to them that there was a connection between the large grow site south of the fence and the area north of the house near the Wrights' utility shed, including bags of the same brand of potting soil, Solo cups, and

13

black potting containers. Officers also found a dog crate at the large grow site, and the dog crate was similar to a dog crate box that was found in an open trailer near the Wright's shed. *See* Watson Dep. 84:13-20 ("What I'm saying is that there was a box that had contained a wire crate that was on the property by the shed and a similar dog crate was recovered at the second grow."). According to Mrs. Wright, the dog crate box was from a wire crate she purchased to corral some of her cats. L. Wright Dep. 268:5-272:7.

**IV.  The Search Warrant, the Search, and the Arrests**

Bolen and Goodrich returned to the area near the Wright's utility shed, and they were met by Defendant Jerald Watson, a Harris County deputy sheriff. It is undisputed that, at that point, the officers did not see any plants in the containers in the area under the pine tree near the shed. The officers discussed what they had seen, and Goodrich told Watson that he had seen "juvenile plants in Solo cups that appeared to be marijuana plants" in that area. Watson Dep. 57:11-22. Watson did not see any marijuana near the shed. *Id.* 60:12-16.

Based on what officers saw at both the large grow site and the area near the Wrights' shed, Watson was tasked with seeking a search warrant for the Wright Property. *See* Watson Dep. 72:5-10 (stating that officers decided to seek a search warrant "based on the totality of everything that was located on the

14

property, in conjunction with the grow, as far as similar type cups, similar type potting soil, bamboo stakes, the pine straw, the well-beaten path from the grow to the house").

Watson swore out the search warrant application and presented it to Harris County Chief Magistrate Judge Jennifer Webb. Watson's affidavit in support of his application for a search warrant states, in pertinent part:

> On 06/27/2013 this deputy along with others were conducting a joint operation with the Governors Drug Task Force. The task force was focused on marijuana eradication. The Georgia State Patrol was flying over the residence located at 525 R. D. Brown Road. Troopers observed several containers near a small building that appeared to have marijuana growing in them. The ground team was notified of the observation and responded to the location. Upon arrival the ground team located approx. six (6) marijuana plants near a shed, and then they left to check on a larger grow near the property line of the residence and when they returned to the six plants had been removed. Located at the larger grow Agents located bags of potting soil which matched the same type of potting soil bags located on the property at 525 R.D. Brown Road. In an open trailer an empty dog wire crate box matching a wire crate that was located at the larger grow containing marijuana seedlings. Several plastic Solo cups were located at the larger grow that matched Solo cups found on the property of 525 R.D. Brown Road.

Webb Aff. Ex. 1, Affidavit & Application for a Search Warrant, ECF No. 71-1 at 5. Mr. Wright contends that two pieces of information that Watson included in the warrant application were not actually within the collective knowledge of the officers.

First, Mr. Wright disputes that there were any marijuana seedlings near the utility shed. It is undisputed that Watson

did not see any marijuana seedlings near the shed.  And, as Defendants acknowledge, there were no seedlings near the shed when Watson arrived on the scene.  Furthermore, the officers did not photograph or confiscate the seedlings they say they saw. Mr. Wright thus maintains that it is reasonable to infer that the other officers, including Goodrich, did not see any small plants in the trays under the pine tree near the utility shed.

Second, Wright asserts that the officers' descriptions of the plant containers at each site were so inconsistent that it was not within the officers' collective knowledge that there were Solo cups at both locations.  All of the officers testified that the smaller plants were in some type of cup.[4]  And the photographs Mr. Wright pointed to in support of this assertion show two types of containers: black plastic pots and red and blue Solo-type cups.  Stinson Dep. Exs. 1, 13-15, 27, ECF No. 76.

Mr. Wright did not point to any evidence to dispute that the officers told Watson that the same type of potting soil bags

---

[4] *See* Wofford Dep. 44:10-14, ECF No. 81 (stating that he could see "a little tray of some sort with some little cups that resembled the same thing that we saw down next to the confirmed site"); Bolen Dep. 33:24-34:7 (stating that the helicopter crew wanted two areas checked "because there was several similar items that were -- like potting cups, and things like that, that matched the same area with the confirmed marijuana grow"); Watson Dep. 85:13-86:12 (stating that the same type of cups were located at both sites); Goodrich Dep. 23:4-7 (stating that he saw "plastic cups"); Stinson Dep. 32:14-19, ECF No. 76 (stating that she saw juvenile plants in "black cups" and in red and blue "Solo-type cups").

were located at the grow site and on the property at 525 R.D. Brown Road. Mr. Wright also did not point to any evidence to dispute that the officers told Watson that there was an empty box that had contained a wire dog crate in an open trailer near the shed that was similar to a wire dog crate that was found at the grow site. *See* Watson Dep. 84:13-20 ("What I'm saying is that there was a box that had contained a wire crate that was on the property by the shed and a similar dog crate was recovered at the second grow.").

Based on Watson's search warrant affidavit, Judge Webb found that probable cause existed for a search, and she issued a search warrant for the house and curtilage located at 525 R.D. Brown Road. When Watson returned with the search warrant, the officers executed it. Pitts and Goodrich did not participate in the search. During the search, the officers discovered approximately 8.9 grams of marijuana in and around the Wrights' house. They also located fifty-four marijuana plants at the large grow site, which was on the neighbor's lot outside the black chain-link fence. The officers seized some personal property from the house and surrounding area, including: a utility trailer, two laptop computers, a gun collection, and a Kawasaki "Mule" ATV.

During the search, Mr. Wright arrived home. Mr. and Mrs. Wright were both arrested for felony manufacture of marijuana,

misdemeanor possession of marijuana, and misdemeanor possession of drug related objects.    The next day, Watson applied for arrest warrants on these charges, and Judge Webb issued the arrest warrants.

**V.    The Aftermath**

In August 2013, a civil forfeiture action was filed against Mr. and Mrs. Wright.    It alleged that Mr. and Mrs. Wright possessed more than four ounces of marijuana, that the property seized during the search was in close proximity to the marijuana, that the property seized during the search was used to facilitate the possession of the marijuana, and that the Wright Property was used to grow marijuana.    In his answer to the civil forfeiture action, Mr. Wright asserted that all of the seized property at issue in the civil forfeiture proceeding—the ATV, the laptops, the guns, and the house itself—belonged to Mrs. Wright.    Defs.' Mot. for Summ. J. Ex. H, Mr. Wright's Verified Answer ¶ 3, ECF No. 71-8 at 6-9.    He also asserted the innocent owner defense, averring that he was not legally accountable for the conduct giving rise to the forfeiture, that he did not know or have reason to know about the conduct giving rise to the forfeiture, and that he did not hold the property jointly "with a person whose conduct gave rise to its forfeiture." *Id.* ¶ 5(c).    Mr. Wright's answer did not challenge the legality of the search.

Over the next fifteen months, the Wrights' attorney negotiated with the Harris County sheriff regarding the forfeiture action and the criminal charges against the Wrights. According to Wright, the sheriff offered to return the seized property and to agree to a plea deal involving no jail time for Mrs. Wright if the Wrights agreed to pay $150,000. Wright Aff. ¶ 9. The Wrights rejected that offer. The sheriff later offered to have the criminal charges against Mr. Wright dismissed if Mrs. Wright pled guilty to marijuana possession and the Wrights paid $20,000. *Id.* The Wrights ultimately entered a consent judgment in the civil forfeiture action under which the lien on the Wright Property was released and the personal property was returned to them in exchange for a payment of $20,000. After the Wrights reached an agreement in principle on the civil forfeiture action, Mrs. Wright pled guilty to marijuana possession and was sentenced to probation. The criminal charges against Mr. Wright were dismissed, and a consent judgment of civil forfeiture was entered.

As a result of his arrest for a felony, Mr. Wright's employer terminated his employment. At the time of his termination, Mr. Wright was his employer's company treasurer and vice president of finance earning an annual base salary of more than $200,000.00.

DISCUSSION

Mr. Wright asserts Fourth Amendment claims under 42 U.S.C. § 1983 against Watson, Goodrich, and Pitts in their individual capacities.[5]  Mr. Wright also asserts state law claims against these Defendants in their individual capacities.  Mr. Wright contends that the initial search of the Wright Property was unreasonable, that the search of the home was unreasonable, that his arrest was unreasonable, that the seizure of the personal property was unreasonable, and that Watson's actions amounted to malicious prosecution.  Defendants contend that they are entitled to qualified immunity on Mr. Wright's § 1983 Fourth Amendment Claims and that they are entitled to official immunity on Mr. Wright's state law claims.

## I.   Fourth Amendment Claims

Section 1983 provides an avenue for individuals to bring suit against state actors to enforce individual rights secured by the United States Constitution.  Mr. Wright brought § 1983 claims against Defendants, claiming that Defendants, acting under color of state law, violated his Fourth Amendment rights.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

---

[5]  Mr. Wright originally sued all of the officers involved in the searches, including Bolen, Bracewell, and Wofford.  Mr. Wright later moved to dismiss his claims against these officers, and the Court granted his motion.

"Generally, a search is reasonable under the Fourth Amendment when supported by a warrant or when the search fits within an established exception to the warrant requirement." *United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006). A seizure is generally reasonable if it is supported by probable cause. *Croom v. Balkwill*, 645 F.3d 1240, 1246 (11th Cir. 2011) ("Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime.").

Defendants assert that they are entitled to qualified immunity on all of Mr. Wright's § 1983 claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a

21

mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

To be entitled to qualified immunity, a public official must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Ziegler v. Martin Cty. Sch. Dist.*, No. 15-11441, 2016 WL 4039667, at *10 (11th Cir. July 28, 2016) (quoting *Lee*, 284 F.3d at 1194). Here, it is undisputed that the officers were acting within their discretionary authority when they searched the Wright Property and arrested Mr. Wright. Mr. Wright must therefore establish that Defendants are not entitled to qualified immunity. To do this, Mr. Wright must show that the facts viewed in the light most favorable to him establish "a violation of a constitutional right and that the constitutional right was clearly established at the time of [the officers'] conduct." *Perez*, 809 F.3d at 1218. "The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation." *Ziegler*, 2016 WL 4039667, at *10 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004)).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Id.* at \*10 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In the Eleventh Circuit, "the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Id.* at \*10 n.12 (quoting *Lee*, 284 F.3d at 1197 n.5). "A right may be clearly established for qualified immunity purposes in one of three ways: '(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir.2009)).

A.   Illegal Search Claim Based on the Pre-Warrant Search

Mr. Wright contends that the initial, pre-warrant search of the area around the shed on the Wright Property was illegal. Defendants argue that the initial search did not violate the Fourth Amendment for two reasons. First, Defendants argue that the area searched was an "open field" that is not entitled to Fourth Amendment protection. Second, Defendants argue that the initial search was justified by probable cause and exigent

circumstances.   As discussed in more detail below, the Court finds that it was not clearly established in June 2013 that the area near the shed was part of the curtilage of the Wrights' home such that it was entitled to Fourth Amendment protection. Thus, Defendants are entitled to qualified immunity on Mr. Wright's claims based on the initial search, and the Court need not decide whether the warrantless search was authorized due to exigent circumstances.[6]

Mr. Wright did not point to any case law with indistinguishable facts that clearly establishes that the pre-warrant search of the area near the shed was unlawful, and he does not appear to argue that the officers' conduct was so egregious that a constitutional right was clearly violated. Thus, Mr. Wright argues that a broad statement of principle in

---

[6] If the Court had to decide whether the exigent circumstances exception applies, the Court would likely conclude that it does not. "The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016).   "It permits, for instance, the warrantless entry of private property . . . when police fear the imminent destruction of evidence." *Id.*  A jury could conclude, based on the Wrights' testimony, that there was no path from the house to the grow site and that there was no ATV moving about on the property.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (noting "that the 'presence of contraband without more does not give rise to exigent circumstances,' though an exigent circumstance may arise 'when there is danger that the evidence will be destroyed or removed'" (quoting *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc)).   If there was no ATV moving about the property and if there was no path to the grow site, it is doubtful that the officers had a reasonable belief to suspect that evidence might be destroyed before a warrant could be secured. Thus, the Court could not reasonably conclude that the exigent circumstances exception applies *as a matter of law.*

the case law clearly establishes the constitutional right he seeks to vindicate. Under this method of establishing a clearly established right, "the salient question is whether 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *D.H. v. Clayton Cty. Sch. Dist.*, No. 14-14960, 2016 WL 4056030, at *9-10 (11th Cir. July 29, 2016) (quoting *Hill*, 797 F.3d at 979).

Mr. Wright has an insurmountable hurdle to overcome regarding Defendants' trespass on his property and their warrantless snooping around his shed. It was not clear at the time of the search that the area near the shed was entitled to Fourth Amendment protection. In fact, a strong argument could be made that the law was clear that it was not. Justice Holmes first explained more than ninety years ago that "the special protection afforded by the Fourth Amendment to the people in their 'persons, houses, papers and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester v. United States,* 265 U.S. 57, 59 (1924). This constitutional principle, which is commonly referred to as "the open fields doctrine," "permits police officers to enter and search a field without a warrant." *Oliver v. United States*, 466 U.S. 170, 173 (1984). Unfortunately for Mr. Wright, the area around his shed likely

falls within the definition of "open field" for Fourth Amendment purposes.

The discussion in the case law regarding the Fourth Amendment and "open fields" does not always yield absolute clarity. Fundamentally, it is important to understand that the Fourth Amendment makes no mention of "open fields." But the principle that "open fields" are not afforded Fourth Amendment protection is derived from the language of the Amendment. The Amendment only protects a "person," his "papers," his "house," and his "effects." Thus, the reason an "open field" is not entitled to Fourth Amendment protection is because it is not a person's "house." A person's house is not confined to the physical structure that shields him from the elements; it includes that area immediately adjacent to the structure and intimately connected to it: the curtilage. But it is well established that those areas of a person's property beyond the curtilage are not part of the house for purposes of the Fourth Amendment. And those areas are often referred to in short-hand as "open fields," even though they may not, upon observation, appear to be "open" or a "field." As the Supreme Court explained, "open fields do not provide the setting for those intimate activities [that occur within the home and its curtilage] that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S.

at 179. Thus, "the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *United States v. Dunn*, 480 U.S. 294, 304 (1987) (quoting *Oliver*, 466 U.S. at 180 n.11). Regardless of the physical attributes of the "open field," the key question is whether the area is part of a person's house, including the curtilage, which is what the Fourth Amendment's text envisions. *See Oliver*, 466 U.S. at 176 (noting that this principle is "founded upon the explicit language of the Fourth Amendment").

The analysis of the open fields principle has evolved beyond a mere textual examination. Support for it has also rested on a "reasonable expectation of privacy" test. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). And there is not the same expectation of privacy in "open fields" as there is in one's house. Thus, such areas are not protected by the Fourth Amendment. Even though the cases have not always expressly compared the expectation of privacy in a house to that of another area for which protection is sought, it has been recognized that "[t]he [Fourth] Amendment does not protect the merely subjective expectation of privacy, but only those 'expectation[s] that society is prepared to recognize as "reasonable."'" *Oliver*, 466 U.S. at 176 (quoting

*Katz*, 389 U.S. at 361).   "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."   *Id.* at 178.   The Supreme Court noted that "[i]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas."   *Id.* at 179.   For these reasons, officers do not need probable cause or a warrant to search open fields or other areas that are generally beyond the house and its curtilage.

The Court rejects Mr. Wright's argument that the shed area is part of his home's curtilage.   The reason the Fourth Amendment protects the curtilage of a home is because the curtilage is "considered part of home itself for Fourth Amendment purposes."   *Id.* at 180; *accord United States v. Taylor,* 458 F.3d 1201, 1206 (11th Cir. 2006) ("The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself.").   "Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."   *Oliver*, 466 U.S. at 180.   The Supreme Court noted that in the case of open fields, "the general rights of property protected

by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Id.* at 183-84.

The courts use four factors to answer the question whether an area of property is curtilage such that a property owner should reasonably expect the area "to be treated as his home": "(1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and (4) the steps the resident takes to protect the area from observation." *Taylor*, 458 F.3d at 1206 (citing *Dunn*, 480 U.S. at 301).  The Supreme Court has noted that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

Mr. Wright argues that it should have been clear to the officers in this case that the area near the shed was within the curtilage of the home and thus off limits.  Mr. Wright argues that the officers should have known, based on the perimeter fence and the vegetation around the shed, that the Wrights had a legitimate expectation of privacy in that area.  Mr. Wright also argues that in the case of a large country home, as opposed to a single-wide trailer or a more modest home on a large rural lot,

29

the curtilage should extend to the perimeter fence because those who dwell in luxury homes have greater expectations of privacy than others. But Mr. Wright did not cite any case law to support his argument that it should have been clear to the officers that the area near the shed was within the curtilage of the Wrights' home. Rather, he cited the dissent in *LoGiudice v. Georgia*, 309 S.E.2d 355 (1983) (Smith, J., dissenting), in which Justice Smith questioned the continued viability of the open fields doctrine and argued that the searched area must truly be "open" for the open fields doctrine to apply. But, as discussed above, the U.S. Supreme Court rejected this argument in *Oliver* and *Dunn*—both of which were decided after Justice Smith's dissent in *LoGiudice. See Dunn*, 480 U.S. at 304 ("[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." (quoting *Oliver*, 466 U.S. at 180 n.11)).

The Court is sympathetic to Mr. Wright's argument that he had a general subjective expectation of privacy in the area enclosed by his perimeter fence, including his shed. But a remote outbuilding that serves no purpose other than to cover a well or store garden materials is simply not a "house" under any reasonable definition of that term. As discussed previously, the Fourth Amendment does not protect all of a person's

property.   Both the text of the Amendment and the case law
construing it make this clear.   At a minimum, the Court cannot
conclude that "every objectively reasonable government official
facing the circumstances" Defendants faced would know, based on
the case law as of June 2013, that the area near the shed was
within the curtilage of the Wrights' house and thus off limits.
*D.H.*, 2016 WL 4056030, at *9–10 (quoting *Hill*, 797 F.3d at 979).
Here, the shed was at least one hundred yards from the home.
The courts have concluded that much shorter distances were so
"substantial" that the area should not "be treated as an adjunct
of the house." *Dunn*, 480 U.S. at 302; *accord Thomas v. Georgia*,
417 S.E.2d 353, 357 (Ga. Ct. App. 1992) (finding that a
greenhouse thirty yards from a mobile home on a two acre lot was
not within the curtilage).[7]   The present record establishes that
the shed was used for storing tools and gardening supplies and
as a well house, although the present record does not establish
that the officers could have known the shed was a well house
unless they entered it.   The shed was inside the perimeter fence
that surrounded the entire property, but a perimeter fence "does
not create a constitutionally protected interest in all the open
fields on the property." *Taylor*, 458 F.3d at 1208; *accord*

---

[7] While only cases from the U.S. Supreme Court, the Eleventh Circuit,
and the Georgia Supreme Court can clearly establish the law, "opinions
from other courts can suggest that reasonable jurists would not know
that certain factual situations rise to the level of constitutional
violations, and therefore reasonable officers would not either."
*Coffin v. Brandau*, 642 F.3d 999, 1016 n.16 (11th Cir. 2011).

*United States v. Nichols*, 248 F. App'x 105, 107 (11th Cir. 2007) (finding that even if "no enclosure clearly delineate[s] the curtilage of the home," the property owner "cannot be deemed to have a reasonable expectation of privacy throughout the entire" twelve acre plot). There was no internal fence surrounding both the shed and the house, the house was not visible from the shed, and the shed was not visible from the house. *See Taylor*, 458 F.3d at 1207 (suggesting that buildings within an internal fence that also surrounds a home are within the curtilage). And, the shed itself was visible from the road; the chain link perimeter fence (or split rail fence) did not prevent the area from being seen. *See Dunn*, 480 U.S. at 303 (finding that livestock fence did not protect area from observation). Based on this authority, it was not clearly established in June 2013 that a shed at least 100 yards from a home, which was not inside an interior fence that also surrounded the home and which was not visible from the home but was visible from the street, was within the curtilage of the home.

The Court is aware that the Eleventh Circuit concluded that "[t]he 'outer limits of the curtilage' have been expressly defined to be 'the outer walls of the extreme outbuildings of the curtilage.'" *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) (quoting *United States v. Williams*, 581 F.2d 451, 454 (5th Cir. 1978)). In light of the precedent discussed

above, the Court is skeptical that the shed is an extreme outbuilding of the curtilage. But even if the Wrights' shed did form the edge of the curtilage, the search of the area near the shed was not clearly unlawful. In *Williams*, for example, the former Fifth Circuit concluded that officers' search around a shed that formed the outer limits of a home's curtilage was not unlawful because there is no expectation of privacy "as to the area outside and beyond" such outbuildings. *Williams*, 581 F.2d at 454;[8] *see also Thomas*, 417 S.E.2d at 357 (upholding search of greenhouse thirty yards from a mobile home on a two acre plot of land, where there was no internal fence and where a wooded area separated the greenhouse from the mobile home). Thus, even if the shed formed the edge of the curtilage, a reasonable jurist—and thus a reasonable officer—could conclude that searching around the shed was lawful.

In sum, Mr. Wright did not point the Court to any authority clearly establishing as of June 2013 that a search like the initial search Defendants undertook violates the Fourth Amendment. For all of these reasons, the Court finds that Defendants are entitled to qualified immunity on Mr. Wright's claims based on the initial, pre-warrant search of the Wright Property. Defendants are likewise entitled to official immunity

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

on any state law claims Mr. Wright asserts based on the pre-warrant search.

### B.   Illegal Search Claim Based on the Search of the Home

Mr. Wright asserts that even if Defendants are entitled to qualified immunity based on their initial search of the area near the shed, they are not entitled to qualified immunity for Mr. Wright's claim based on the search pursuant to the search warrant.   Mr. Wright argues that Defendants did not have arguable probable cause to seek the search warrant, even if the initial search was lawful.   Construing the facts in the light most favorable to Mr. Wright, as the Court must do at this stage in the litigation, the Court agrees.   "Although a jury may discredit [Mr. Wright's] version of events at trial, [the Court is] not at liberty to make that determination on summary judgment." *Mitchell v. Stewart*, 608 F. App'x 730, 734 (11th Cir. 2015) (per curiam).

As a preliminary matter, Mr. Wright did not point to any evidence that Pitts was involved in the discussions regarding the search warrant or the decision to seek the search warrant. And there is no evidence that he made any statements that were relied on in the search warrant; as Mr. Wright pointed out, Pitts was "unaware" of whether the juvenile plants officers say they saw near the shed were marijuana.   Pitts Dep. 85:15-21. Mr. Wright did not point to evidence to dispute that Pitts only

participated in the initial search, left the scene, and had no further involvement. *See* Defs.' Statement of Undisputed Material Facts ¶¶ 34-35 (stating that Pitts left the scene after Goodrich arrived and was briefed and that Pitts had no other involvement with the incident); Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 34-35, ECF No. 88-4 (stating that paragraphs 34 and 35 of Defendants' Statement of Material Facts are "Not Controverted"). Thus, based on the present record, Pitts is entitled to summary judgment on all the claims based on the search warrant, including the illegal search claim based on the officers' search of the house.

It is undisputed that both Goodrich and Watson were involved in the decision to seek the search warrant and that the search warrant was based, at least in part, on what Goodrich told Watson. The Court therefore analyzes this claim against these two Defendants.

Defendants do not dispute that officers needed a search warrant supported by probable cause to search inside the Wrights' home. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). Defendants also do not dispute that it was clearly established as of June 2013 that

"falsifying facts to establish probable cause is patently unconstitutional." *Kingsland*, 382 F.3d at 1232.   And Defendants do not dispute that it was clearly established as of June 2013 that "[a] search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, *see Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), and this rule includes material omissions, *see United States v. Martin*, 615 F.2d 318, 328-29 (5th Cir. 1980)." *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002).   A warrant is only "valid if, absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 171-72).

Based on the current record, with all reasonable inferences drawn in favor of Mr. Wright, a reasonable juror could conclude that Watson and Goodrich intentionally manufactured probable cause for the search warrant by stating that officers observed marijuana plants near the Wrights' shed.   Defendants contend that it is not reasonable to draw this inference from the present record.   A reasonable juror could certainly believe the officers' statements that they saw marijuana near the shed and that it was later removed.   But a reasonable juror could also conclude that there were never any marijuana plants near the shed based on the subsequent absence of marijuana plants plus the undisputed evidence that officers did not photograph

marijuana, confiscate marijuana, or take other steps to prevent someone from tampering with the evidence they claim to have seen.  The Court thus finds that a genuine fact dispute exists on whether the following statement in the warrant application was a deliberate lie: "the ground team located approx. six (6) marijuana plants near a shed" on the Wright Property.  Webb Aff. Ex. 1, Affidavit & Application for a Search Warrant, ECF No. 71-1 at 5.

In addition, a genuine fact dispute exists on whether Watson, with input from Goodrich, intentionally omitted material information from the warrant affidavit.  First, the affidavit states that the helicopter team "observed several containers near a small building that appeared to have marijuana growing in them," *id.*, even though a reasonable juror could conclude, based on Bracewell's testimony, that the helicopter team could not tell what type of juvenile plants were in the cups.  Second, the affidavit states that the large grow was "near the property line of the residence," *id.*, but did not state that the large grow site was outside the perimeter fence of the Wright Property or that it was not actually on the Wright Property.[9]

---

[9] Neither side pointed to evidence on whether officers could have determined whether the larger grow site was on the Wright Property before seeking the warrant.  The record does establish, however, that officers were able to use property tax records to figure out that Mrs. Wright owned the property at 525 R.D. Brown Road before Watson applied for the search warrant.  *See* Webb Aff. Ex. 1, Affidavit & Application

Without these alleged misstatements and omissions, the search warrant is only valid if the remaining information supports a finding of probable cause. *Dahl*, 312 F.3d at 1235 (citing *Franks*, 438 U.S. at 171-72). For the search warrant affidavit at issue here, the remaining information is: (1) potting soil found at the large grow site "matched the same type of potting soil bags located on" the Wright Property, (2) officers found an "open trailer" somewhere—though the affidavit does not say where—that contained "an empty dog wire crate box matching a wire crate that was located at the larger grow containing marijuana seedlings," and (3) "[s]everal plastic Solo cups were located at the larger grow that matched Solo cups found on the" Wright Property. Webb Aff. Ex. 1, Affidavit & Application for a Search Warrant, ECF No. 71-1 at 5.

Defendants argue that these facts clearly tie the Wrights to the large marijuana grow site and are sufficient to establish probable cause for a warrant to search the Wrights' home. The Court disagrees. The affidavit simply establishes that the Wrights kept potting soil and Solo cups near their potting shed, that similar items were found at the large grow site, and that a dog crate box was found in a trailer at some undisclosed location while a dog crate was found at the large grow site. As

---

for a Search Warrant, ECF No. 71-1 at 5 (stating that property to be searched belongs to Mrs. Wright).

the Court previously observed, potting soil and Solo cups are common items used by innocent homeowners for innocent purposes every day. The affidavit does not establish that there was anything special or unique about these ordinary, innocuous items such that the presence of the items at both locations "allow a conclusion that there is a fair probability of finding contraband or evidence" in the Wrights' home. *Brundidge*, 170 F.3d at 1352. Nor does the fact that officers found a dog crate at the large grow site and a matching dog crate box in an open trailer at some undisclosed location suggest a connection to contraband. And, if Plaintiffs are believed, Defendants themselves did not think that the items they saw on the Wright Property gave rise to probable cause because they thought they had to bolster the affidavit by allegedly lying about seeing marijuana seedlings and by omitting material facts about the location of the large grow site. For all of these reasons, the Court concludes that without the alleged misstatements and omissions, the remaining information in the affidavit does not support a finding of probable cause.[10]

Defendants argue, and the Court recognizes, that magistrate judges are traditionally entitled to a "high level of deference

---

[10] The Court emphasizes that it is not finding that the officers did, in fact, make material misrepresentations and omissions in the search warrant affidavit. The Court is simply finding that based on the present record viewed in the light most favorable to Mr. Wright, a jury could find in Mr. Wright's favor on this question.

. . . in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).  But here, if Mr. Wright's evidence is believed, then Judge Webb's probable cause determination was based in large part on one material misrepresentation and two material omissions.  Defendants argue that the Court should also consider Judge Webb's affidavit containing a post hoc probable cause analysis, which Judge Webb prepared more than three years after she issued the search warrant.  The affidavit speculates as to what Judge Webb might have done if Watson had presented her with different information.  The Court is not convinced that Judge Webb's legal conclusions on this hypothetical are entitled to deference. Even if the Court were to consider Judge Webb's analysis, that analysis does not address at least one of the material omitted facts and thus does not establish that Judge Webb would have found probable cause based solely on the potting soil, Solo cups, and dog crate box.  Furthermore, the "traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  The key question for the Court is whether, without the material

40

misrepresentation and two material omissions, Judge Webb had a substantial basis for concluding that probable cause existed for a search of the Wrights' home.

Judge Webb stated in her affidavit that she would have found probable cause even if the search warrant affidavit had not stated that officers saw marijuana near the shed.  Webb Aff. ¶ 5.  Webb further suggested that it would not have mattered to her "whether the large marijuana grow site was actually on the Property or immediately adjacent to the Property."[11]  *Id.*  But Webb's affidavit also emphasizes that aerial surveillance spotted "what appeared to be marijuana in several containers" on the Wright Property.  *Id.*  As discussed above, there is a genuine fact dispute on whether Watson omitted material facts related to that statement—namely that the helicopter team could not tell from the air if the juvenile plants near the shed were marijuana.  Webb's affidavit does not establish that she would have found probable cause for a search of the Wrights' home without *some* statement in the affidavit that marijuana was actually spotted near the Wrights' shed.  Accordingly, Webb's affidavit does not establish that the search warrant affidavit,

---

[11] While it may not be a dispositive factor, it *does* matter whether the large grow site was on neighboring property and not the Wright Property, particularly given the absence of any statement in the affidavit clearly connecting the site to the Wrights' home. Defendants did not cite any authority, and the Court found none, suggesting that an officer may search a person's home based solely on contraband found on a next door neighbor's property and the presence of a couple of common innocuous items at both locations.

when stripped of one material misstatement and two material omissions, supported a finding of probable cause.

For the reasons discussed above, the Court concludes that a jury could find that Watson, assisted by Goodrich, deliberately made one material misstatement and two material omissions in the search warrant application.  Without the misstatement and the omissions, there was no probable cause for officers to believe that there was contraband inside the Wrights' home and thus no probable cause to support the search.  It was clearly established in 2013 that it is a Fourth Amendment violation to falsify facts to establish probable cause.  Watson and Goodrich are therefore not entitled to qualified immunity on the illegal search claim based on the officers' search of the Wright Property pursuant to the allegedly falsified warrant application.

C.  False Arrest Claim

Mr. Wright also asserts a claim for false arrest.  "[A] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Carter v. Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)). "But where probable cause supports an arrest, it acts as 'an absolute bar to a section 1983 action for false arrest.'" *Id.* (quoting *Kingsland*, 382 F.3d at 1226).

"Probable cause to arrest exists if 'the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Kingsland*, 382 F.3d at 1226). Even if an officer does not have probable cause to arrest, the officer is entitled to qualified immunity if *arguable probable cause* supported the arrest, which means that "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Id.* at 1319-20 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, (1987)). "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Lee*, 284 F.3d at 1195 (quoting *Scarbrough v. Myles*, 245 F.3d 1299 at 1302-03 (11th Cir. 2001)). As long as officers have arguable probable cause to arrest for *some* offense, the arrest is valid; the "validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Id.* at 1195-96 (quoting *Bailey v. Bd. of Cty. Comm'rs*, 956 F.2d 1112 at 1119 n.4 (11th Cir. 1992)).

When officers searched the Wright Property pursuant to the search warrant, they found 8.9 grams of marijuana in and around the Wrights' home.  Officers arrested Mr. and Mrs. Wright for felony manufacture of marijuana, misdemeanor possession of marijuana, and misdemeanor possession of drug related objects. Mr. Wright acknowledges that under Georgia law, it is a crime to possess marijuana.  *See* O.C.G.A. § 16-13-2(b) (making it a misdemeanor to possess one ounce or less of marijuana).  Mr. Wright also acknowledges that the officers found marijuana in his home.  He acknowledges that he admitted to living in the home.  And he acknowledges that even if the marijuana would have been suppressed in a criminal action, "the exclusionary rule does not apply in a civil suit against police officers." *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016).  In *Wigington*, the Eleventh Circuit concluded that officers who obtained a warrant to arrest two individuals based on items found in their trailer could "rely on evidence that they found in the . . . trailer to prove that the arrest warrants were supported by probable cause"—even though the evidence that provided probable cause "was obtained during an illegal search." *Id.* at 1267-68.  Mr. Wright concedes that based on *Wigington*, the officers may rely on the marijuana found in his home to establish probable cause.

Mr. Wright argues, however, that Defendants are not entitled to qualified immunity because there is a fact question on whether he actually possessed the marijuana that the officers found. Mr. Wright contends that he could not have been convicted for marijuana possession based solely on his presence at the premises where the marijuana was found because Mrs. Wright had equal access to the home. *See, e.g., Sing v. Georgia*, 458 S.E.2d 493, 494 (Ga. Ct. App. 1995) (explaining the equal access doctrine, which may be used to rebut the presumption that an individual constructively possesses contraband found at a location he owns or controls). But the relevant question here is not whether Mr. Wright ultimately could have been convicted for possessing the marijuana found in and around his home. The relevant question is whether a reasonable officer "in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Carter*, 821 F.3d at 1319-20 (quoting *Anderson*, 483 U.S. at 641).

Mr. Wright appears to contend that the officers should have concluded that the marijuana officers found in and around the house belonged solely to Mrs. Wright and not to him. But Mr. Wright did not point to any evidence to explain why the only reasonable inference officers could draw based on the 8.9 grams of marijuana found scattered in and around his home was that all

of it belonged solely to Mrs. Wright.  "Possession may be either actual or constructive." *United States v. Faust*, 456 F.3d 1342, 1345 (11th Cir. 2006); *accord Bailey v. State*, 669 S.E.2d 453, 456 (Ga. Ct. App. 2008).  Constructive possession "can be established by either direct or circumstantial evidence and by inferences arising from the surrounding circumstances," and it may be proved if "a defendant maintained dominion or control over the drugs or over the premises where the drugs are located." *Faust*, 456 F.3d at 1345-46 (quoting *United States v. Harris*, 20 F.3d 445, 453 (11th Cir. 1994)); *accord Bailey*, 669 S.E.2d at 456; *see also United States v. Flanders*, 752 F.3d 1317, 1332 (11th Cir. 2014) (finding that the presence of drugs in a shared bathroom of a house "permitted the inference that [the defendant] was in joint constructive possession of the drugs").

Mr. Wright admits that he lived in the house, which could reasonably be construed as an admission that he controlled the premises and thus had constructive possession of the marijuana officers found there.  At a minimum, the marijuana found in the home where Mr. Wright admitted that he lived was enough to establish arguable probable cause to believe that he possessed marijuana.  "If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010).

For these reasons, Defendants are entitled to qualified immunity on Mr. Wright's false arrest claim. For the same reasons, Defendants are entitled to official immunity on Mr. Wright's state law unreasonable seizure and false imprisonment claims. *See Smith v. Wal-Mart Stores E., LP*, 765 S.E.2d 518, 521 (Ga. Ct. App. 2014) (noting that an essential element of a false imprisonment action is an unlawful detention).

> D.   Property Seizure Claim

Mr. Wright's property seizure claim is based on the seizure of certain personal property, including a utility trailer, two laptop computers, a gun collection, and a Kawasaki "Mule" ATV. All of this property was involved in the civil forfeiture proceeding. Mr. Wright's verified answer to the forfeiture action states that Mrs. Wright owned all of the property that was at issue in the civil forfeiture proceeding. Defs.' Mot. for Summ. J. Ex. H, Answer to Civil Forfeiture Compl. ¶ 3, ECF No. 71-8 at 7. Mr. Wright stated, after being duly sworn, that the statements in his answer were true and correct. *Id.* at 4, ECF No. 71-8 at 9. Mr. Wright did not point to any evidence to contradict his sworn statement that the property belonged to Mrs. Wright and not him. Mr. Wright also did not explain how he has standing to assert claims based on the seizure of Mrs. Wright's personal property. For these reasons, Defendants are entitled to summary judgment on Mr. Wright's property seizure

claim.  For the same reasons, Defendants are entitled to summary judgment on Mr. Wright's state law conversion claim.  *See Hooks v. Cobb Ctr. Pawn & Jewelry Brokers, Inc.*, 527 S.E.2d 566, 569 (Ga. Ct. App. 1999) ("To establish a prima facie case for conversion, plaintiff is required to show title to the property or the right of possession[.]").

E.   Malicious Prosecution Claim

Mr. Wright also alleges a malicious prosecution claim against Watson.  "To recover for malicious prosecution, a plaintiff must prove '(1) the elements of the common law tort of malicious prosecution, and (2) a violation of [his] Fourth Amendment right to be free from unreasonable seizures.'" *Wigington*, 811 F.3d at 1266 (quoting *Kingsland*, 382 F.3d at 1234.  "The common-law elements include '(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.'" *Id.* (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir.2003)).  "A police officer who applies for an arrest warrant can be liable for malicious prosecution if he should have known that his application 'failed to establish probable cause.'" *Id.* (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1553 (11th Cir. 1994)).  An officer can also be liable for malicious prosecution "if he made statements or omissions in his

48

application that were material and 'perjurious or recklessly false.'" *Id.* (quoting *Kelly*, 21 F.3d at 1554).  But "a police officer cannot be liable for malicious prosecution if the arrest warrant was supported by probable cause." *Id.*  Again, the exclusionary rule does not apply in civil cases, and Watson may rely on the evidence that was found during the search to establish probable cause. *Id.* at 1268.

Watson sought the arrest warrants for Mr. Wright for misdemeanor marijuana possession, misdemeanor possession of drug related objects, and felony manufacture of marijuana.  Watson Dep. Ex. 1, Arrest Warrant Affs., ECF No. 83-1 at 27-29.  Mr. Wright does not seriously dispute that the items found during the search provide probable cause support the two misdemeanor charges.  He does contend, however, that Watson did not have probable cause to seek an arrest warrant for felony manufacture of marijuana.  Under O.C.G.A. § 16-13-30(b), "it is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance."  Under this statute, a reasonable officer could have probable cause to believe that Mr. Wright committed the offense of marijuana manufacture if there was evidence that he was growing marijuana. *See Roberson v. Georgia*, 540 S.E.2d 688, 692 (Ga. Ct. App. 2000) (finding that the defendant's "conviction for manufacturing marijuana was supported by

evidence of the [twenty-four] plants, heat lamps, fertilizer, and potting soil").

The marijuana manufacturing charge against Mr. Wright is based on Watson's statement that Mr. Wright possessed the fifty-four marijuana plants found growing on the large grow site adjacent to the Wright Property. *See* Watson Dep. Ex. 1, Arrest Warrant Aff., ECF No. 83-1 at 29. Mr. Wright contends that this assertion is untrue because the fifty-four plants were not his. But he does not dispute that officers found fifty-four plants growing at the large grow site, along with marijuana scattered in and around the Wrights' home and common items at both sites, such as the similar Solo cups and the matching potting soil. Mr. Wright did not point the Court to any authority clearly establishing that a reasonable officer in Watson's position should not believe he had probable cause to arrest Mr. Wright for marijuana manufacture based on all of these facts. Though the Court concluded that the Solo cups and matching potting soil, standing alone, were not enough to link the Wright Property to the grow site, the totality of the circumstances changed when officers found marijuana in and around the Wrights' home pursuant to the search warrant. And under *Wigington,* this evidence must be considered even if the search which discovered it violated the Fourth Amendment. The Court finds that Mr. Wright did not establish that Watson violated clearly

established law in seeking the arrest warrant, and Watson is therefore entitled to summary judgment on the § 1983 malicious prosecution claim. For the same reasons, Watson is entitled to official immunity on Mr. Wright's state law malicious prosecution claim.

>F. Civil Conspiracy Claim

In his Complaint, Mr. Wright alleges that Defendants conspired to violate his Fourth Amendment rights. In his response to Defendants' summary judgment motion, Mr. Wright clarified that he is not asserting an independent conspiracy claim; rather, he alleged conspiracy in his original Complaint to establish liability for all the officers he originally sued. Mr. Wright voluntarily dismissed his claims against most of those officers, and Mr. Wright acknowledges that he no longer needs to rely on a conspiracy theory because he can establish that Watson and Goodrich personally participated in the decision to seek the search warrant. The Court thus finds that to the extent Mr. Wright's Amended Complaint can be construed to assert a stand-alone conspiracy claim, Mr. Wright has abandoned it.

## II. State Law Claims

Mr. Wright brought state law claims for false imprisonment, malicious prosecution, conversion, and unreasonable search and seizure. Defendants contend that they are entitled to official immunity on these claims. Under Georgia law, "an officer

performing a discretionary act is entitled to official immunity unless he or she 'act[ed] with actual malice or with actual intent to cause injury.'" *Bateast v. Dekalb Cty.*, 572 S.E.2d 756, 758 (Ga. Ct. App. 2002) (alteration in original) (quoting *Todd v. Kelly*, 535 S.E.2d 540, 542 (Ga. Ct. App. 2000)). "[Official] immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice or corruption." *Id.* (alteration in original) (quoting *Sommerfield v. Blue Cross & Blue Shield of Ga.*, 509 S.E.2d 100, 102 (Ga. Ct. App. 1998). "[A]ctual malice as used in the context of official immunity requires a deliberate intention to do wrong." *Id.* at 758 (citing *Merrow v. Hawkins*, 457 S.E.2d 336, 337 (Ga. 1996)).

It is undisputed that the challenged actions in this case are discretionary, so Defendants are entitled to official immunity unless there is a genuine fact dispute on whether Defendants acted with actual malice or with actual intent to cause injury. As discussed above, a jury could conclude that Goodrich and Watson made one material misrepresentation and two material omissions in the search warrant affidavit. A jury could thus conclude that Goodrich and Watson knew that they did not have probable cause for a search warrant and manufactured evidence to support the warrant. From this, a jury could infer

that Goodrich and Watson acted with actual malice when they made the decision to seek the search warrant. *See Bateast*, 572 S.E.2d at 758 (finding genuine fact dispute on official immunity because jury could infer that officers arrested the plaintiff despite knowing that she did not commit any crime).

The Court is not convinced that Mr. Wright has established a genuine fact dispute on actual malice to support his false imprisonment/unreasonable seizure claim, his conversion claim, or his malicious prosecution claim. As discussed above, officers had arguable probable cause to arrest Mr. Wright; Mr. Wright did not point to evidence that the property that was allegedly converted belonged to him; and Watson had arguable probable cause to seek the arrest warrants. For these reasons, Defendants are entitled to official immunity on all of Mr. Wright's state law claims, except Watson and Goodrich are not entitled to immunity on Wright's claim based on the search pursuant to the search warrant.

CONCLUSION

As discussed above, Defendants' summary judgment motion (ECF No. 71) is granted in part and denied in part. Pitts is entitled to summary judgment on all of Mr. Wright's claims against him. Watson and Goodrich are not entitled to qualified immunity or official immunity on the illegal search claims based on the officers' search of the Wright Property pursuant to the

search warrant, so their summary judgment motion is denied as to
those claims.  They are entitled to qualified immunity on all of
Mr. Wright's other federal law claims and official immunity on
all of his other state law claims, so their summary judgment
motion is granted as to those claims.

    IT IS SO ORDERED, this 25th day of August, 2016.

                              S/Clay D. Land
                              _____
                              CLAY D. LAND
                              CHIEF U.S. DISTRICT COURT JUDGE
                              MIDDLE DISTRICT OF GEORGIA